Spence Law Office, P.C.
Robert J. Spence, Esq. (RS3506)
Proposed Attorneys for the Debtor
55 Lumber Road, Suite 5
Roslyn, New York 11576
Tel.:(516) 336-2060

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

In re:                                              Chapter 11

                                                                                    Case No.:   19-41348-nhl

NORTHERN BOULEVARD AUTOMALL, LLC,
d/b/a Long Island City Volkswagen,

                                Debtor.

------------------------------------------------------------X

## DECLARATION OF NIKOLAOS LETSIOS IN SUPPORT OF FIRST-DAY MOTIONS

I, Nikolaos Letsios, Pursuant to 28 U.S.C.§ 1746, declare under penalty of perjury as follows:

1.    I am the Managing Member of Northern Boulevard Automall, LLC d/b/a Long Island City Volkswagen (the "Debtor").  I have held this position since 2016.

2.    I am familiar with the Debtor's operations, business and financial affairs, and books and records. Except as indicated otherwise, I have personal knowledge of the facts set forth herein.

3.    On the date hereof, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.    The Debtor is continuing to manage and operate its business as Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.    To enable the Debtor to continue to operate and preserve the value of its assets pending a prompt auction and sale of substantially all its assets pursuant to Section 363 of the Bankruptcy Code, the Debtor is concurrently herewith filing various first-day motions.  I have been contacted by more than one prospective buyer who are very interested in purchasing the dealership.

The Debtor received a written offer of $750,000 plus parts inventory early this morning. Parts inventory is currently valued at about $160,000 based on the Debtor's cost. While the Debtor believes the offer is low, it demonstrates that there is value in the Debtor's business on a going concern basis and in the Debtor's goodwill and VW franchise rights.

6. After describing the Debtor's history, business, and circumstances leading to the commencement of this Chapter 11 case, this Declaration sets forth facts supporting the relief requested in the first-day motions.

**The Debtor**

7. In 2016, Nikolaos Letsios and Spyro Avdoulos, acquired a Volkswagen dealership from its prior owner in or about June 2016. I own 51% of the issued and outstanding membership interests and Mr. Avdoulos owns 49% of the issued and outstanding membership interests in the Debtor.[1]

8. The Debtor operates out of its main location at 56-15 Northern Boulevard, Woodside, NY 11377 (the "Showroom"). The Debtor sells both new and used vehicles and provides maintenance and service on vehicles for its customers. The Debtor has approximately 55 employees.

9. Mr. Avdoulos owns and or controls all of the real estate where the Debtor maintains its business and leases those properties to the Debtor under certain written leases.

10. The current rent for the Showroom according to the lease is $52,190.93. The Debtor also leases property located at 33-20 55th Street (aka 54-20 Broadway, Woodside, NY 11377) (the "Service Department"), where its current rent according to the lease is $33,765.26. The Debtor does also lease space at storage facilities for its vehicles.

---

[1] Mr. Avdoulos contends that he and I are 50-50 partners in the Debtor.

**The Debtor's Cash Flow Issues**

11.    The Debtor has had cash flow issues since in or about 2016. The Debtor's rent expense has been one of the problems. While the Debtor's current rent for the Showroom and Service Department is approximately $85,956.19 in the aggregate[2], by agreement dated April 6, 2016, Mr. Avdoulos agreed that he would "reinvest" all rents above $26,000.00 ($312,000 per annum) for as long as necessary to keep the business in a "healthy financial position." This agreement was made by Mr. Avdoulos as an inducement to the Debtor and Volkswagen ("VW") and or VCI, to proceed with the Debtor's application for approval of the assignment of the franchise to the Debtor and for the floor plan financing and term loan with VCI. VW and or VCI and the Debtor were concerned about the rent expense and the transaction would not have been approved without Mr. Avdoulos' representation concerning the rent and additional investment.

12.    Significantly more than $312,000 per annum was paid by the Debtor each year for rent (over $1.8MM during the period 2016-2019) and there are additional distributions taken by Mr. Avdoulos or his companies of more than $1,000,000 during this same time. Debtor's counsel has advised that he will review payments to pre-petition creditors and insiders.

13.    Because the Debtor needed cash for operations, the Debtor was caused to have to borrow to cover operating expenses. The interest and charges from these other sources of financing cost the Debtor hundreds of thousands of dollars.[3]

14.    Notwithstanding what was paid in rent in the past, the Debtor intends to pay at most, the sum of $26,000 per month pending the sale of its assets in this case, while reserving all of its rights.

---

[2] The Debtor believes that the rent under the existing leases are substantially above market value compared to market rental rates in the immediate area of the Debtor's business premises.

[3] For instance, the advances the Debtor received from Platinum Rapid Funding in 2017 and 2018 cost the Debtor approximately $200,000 in interest and costs.

**History of the Debtor and Events Leading to the Bankruptcy**

15.     The Debtor opened its doors for business in June of 2016.

16.     During 2016 through January 4, 2019, the Debtor was able to remain current with VCI on its floor plan.  I was at the facility nearly every day and making sure that there were no defaults in the audits conducted by VCI.  The Debtor passed each and every audit under my watch. As recently as January 4, 2019, the Debtor had passed a VCI audit.

17.     To address its mounting financial issues, particularly to VCI and NYS Sales Tax, the Debtor determined that a change was needed and that it needed to either sell its assets or receive a significant infusion of capital.  I had many meetings with Mr. Avdoulos to discuss the cash flow issues.  To that end, I stopped taking a salary in or about the end of November 2018 and Mr. Avdoulos was supposed to step into an active role with the Debtor.  The members further discussed a resolution whereby Mr. Avdoulos would infuse additional capital of more than $2MM into the business and would become the sole owner of the Debtor.  The arrangement was never consummated and the Debtor received well short of the capital it needed to remain current with its creditors.

18.     In January and February, things got worse.  As a result of a February 2019 audit, VCI determined that the Debtor was in arrears to VCI in the amount of approximately $900,000.00.

19.     On or about February 18, 2019, VCI stopped funding the Debtor's floor plan and requested and received all of the titles and manufacturer's statements of origin ("MSO") for the vehicles on the floor plan.  They also requested and received keys to the vehicles.  These documents and items were delivered to VCI as requested.  VCI has become a daily presence at the business and the Debtor has fully cooperated with VCI in providing documentation and information as requested.

20.     It was the Debtor's understanding that while it handed over the titles, MSO's and keys that it would still be permitted to sell vehicles and operate its business albeit under VCI's direct

supervision. Unfortunately, that was not the case and VCI has retained the gross proceeds of every transaction since on or about February 18, 2019. There have been approximately forty sales since February 18, 2019 for which VCI holds the purchase price, the sales tax, the registration fee, and all add-ons including but not limited to warranties, ancillary products, documentation fees, and have put a hold on all receivables from VW for warranty work, warranty parts, holdbacks, incentives, etc., leaving the Debtor without funds to operate to pay its operating expenses. Parts are paid for COD and VCI had a pre-petition assignment of warrantee receivables for the parts so the Debtor was laying out for the parts, doing the work and then the reimbursements were presumably going directly to VCI.

**Secured Debt**

21. Pursuant to a Wholesale Financing and Security Agreement dated 2016, Volkswagen Credit, Inc. ("VCI") agreed to lend to finance Debtor's acquisition of inventory. The financing arrangement is generally referred to as a "floor plan."

22. As the existing loans it took out, VCI's floor plan is secured by first-priority liens and security interests in substantially all of Debtor's assets.

23. Currently, the Debtor owns approximately 190 new and used vehicles (the "Vehicles") according to the schedules filed with the Court.

24. Both members of the Debtor guaranteed the floor plan and term loan.

25. Debtor believes that, as of the date hereof, the VCI's secured claim approximates $6.8 million.

26. VCI also took possession of the Debtor's "deal jackets" (all of the pending customer's contracts, regardless of whether they were funded by VCI), which includes all personal financial information of the non-debtor party.

27. In late February 2019, VCI commenced an action (the "Replevin Action") in the United States District Court for the Eastern District of New York, seeking a turnover of the Debtor's assets in which it maintains a security interest.

28. On March 1, 2019, the District Court entered an order in the Replevin Action (the "TRO") restraining and prohibiting the Debtor from conducting any business or paying any of its employees pending a hearing on the TRO, currently scheduled for March 11, 2019.

29. VCI advised the Debtor prior to the filing of this Chapter 11 case that it is no longer permitted to sell any cars in its inventory pending further order of the District Court.

30. In order to prevent the seizure of the Debtor's assets, the Debtor filed a petition for Chapter 11 relief on the Petition Date. A Chapter 11 petition stays the enforcement of the TRO. *In re Adelphia Communications Corp.,* 2006 WL 1559437 at *I (S.D.N.Y. June 7, 2006)("Adelphia filed a bankruptcy petition, thereby staying the district-court action" and Adelphia's obligations under the TRO order. *Id* ).

## **FIRST-DAY MOTIONS**

### A.    **Use of Cash Collateral**

31.    The Debtor's ordinary business activities require cash on hand and cash flow from operations to fund and operate its businesses. The Debtor also require access to additional liquidity to fund its Chapter 11 case while working toward a successful sale of substantially all its assets.

32.    All of the Debtor's cash and cash flow from operations are subject to the prior perfected first-priority liens and security interests of Volkswagen Credit, Inc., and thus constitute cash collateral subject to the provisions of Section 363 of the Bankruptcy Code.

33. Given the substantial liens in all the Debtor's assets, the Debtor is unable at this time to procure adequate post-petition financing in the form of unsecured credit or unsecured debt with an administrative priority under its current circumstances.

34. The Debtor's use of cash collateral and additional funding provided by post-petition financing is critical to allow the Debtor to maintain its day-to-day operations in the ordinary course. Absent use of cash collateral and access to post-petition financing, the Debtor would not be able to continue operating in the ordinary course and any contemplated sale transaction to maximize the value of the Debtor's assets and business may be jeopardized.

35. The Debtor has not reached an agreement with VCI to provide for the use of its cash collateral and the extension of post-petition financing.

36. The Debtor seeks the use of cash collateral with sufficient liquidity cushion during the period of and in the amounts set forth in the Budget submitted with the motion for authorization to use cash collateral.

37. In the event the Debtor is not allowed the use of cash collateral to continue its business operations it will undoubtedly suffer immediate and irreparable harm as the Debtor will have no alternative but to close their doors, discontinue their operations and liquidate their assets. The Debtor believe that a liquidation of its assets will significantly harm not only VCI, but their other creditors. Essentially, an immediate liquidation would be a disaster for the bankruptcy estate and its creditors.

38. Likewise, without the use of the cash collateral the estate will suffer immediate and irreparable harm, by forcing the Debtor to discontinue all operations, terminate the employment of their employees and submit to an immediate liquidation of its assets.

39. There is presently an immediate need for the use of cash collateral in the operation of the Debtor's business, and the Debtor requests interim use of cash collateral for a period of thirty (30) days until a final hearing on the Debtor's proposed use of cash collateral can be scheduled, appropriately noticed to all creditors and parties interest, and held. The Debtor has cash needs for the payment of pre-petition wages to its employees and the payment of expenses incurred by the Debtor in the ordinary course of the Debtor's businesses. The expenses that must be paid within the next thirty (30) days are reflected on the budget submitted with the motion for authorization to use cash collateral.

40. The failure to have use of the cash collateral for the purposes set forth above will cause immediate and irreparable harm to the assets of the Debtor and will result in severe damage and diminution to the value of the Debtor's assets.

**B.**     **Employee Wages and Benefits**

41. Debtor employs approximately 55 people in positions relating to automotive sales, automotive service technicians, part sales, and associated administrative functions.

42. The continued employment and loyalty of Debtor's employees are critical to the success of the Debtor's Chapter 11 case, particularly in the context of the proposed sale of substantially all of Debtor's assets in connection therewith. Indeed, Debtor believes that its employees represent one of the most valuable assets they have and propose to transfer to a prospective third party buyer.

43. In the ordinary course of its business, Debtor paid salaries, wages, and other related obligations to employees generally on a weekly basis.

44. The Debtor will have incurred obligations to most, if not all, of its employees prior to the commencement of this Chapter 11 case that will not be paid and performed in the ordinary course of business until after the commencement of this case.

45. Unless Debtor continues to pay its employees and perform its employee benefits in accordance with its prepetition policies, its employees will suffer personal hardships. Such hardships might cause employee morale to deteriorate and lead employees to seek other employment, potentially disrupting Debtor's business as it pursues a sale.

46. To the best of my knowledge, no employees are owed unpaid compensation in excess of the $12,850 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code.

47. In addition, Debtor seeks authority to continue to provide and pay for its employees with certain benefits, in accordance with its existing prepetition practices.

48. Shop technicians are unions and receive union benefits.

49. Any prospective buyer would need to retain and continue to employ all of the Debtor's key employees (automotive technicians, sales people, general manager, controller). Debtor believes that is in the interests of all of its employees to remain employed by the Debtor and shift to any successful bidder upon consummation of a sale. But, moreover, any departure of Debtor's key employees in this interim period might threaten the Debtor's proposed sale and the success of the Debtor's operations in the interim.

50. I believe that maintain the payment of wages and benefits is necessary to ensure that its employees remain in its employ and reasonable in its scope and application.

51. Debtor believes that maintaining its employees' compensation levels through the interim period will adequately incentivize them to remain in its employment pending the sale, particularly with the proposed sale to a strong dealership as a backdrop.

In conclusion, I believe that the relief requested in the first-day motions is necessary and appropriate to permit the Debtor to continue operating in the ordinary course of business and to maximize the value of its assets.

Dated: March 7, 2019

_____
NIKOLAOS LETSIOS